## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | | |
|---|---|---|
| **MITCHELLVILLE PLAZA BAR LP** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **8:21-CV-00106-PWG** |
| | ) | |
| **THE HANOVER AMERICAN** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Mitchellville Plaza Bar LP, by its undersigned counsel and pursuant to Fed R. Civ. P. 56, moves for summary judgment on both counts of its complaint because there is no dispute of material fact and Plaintiff is entitled to judgment in its favor as a matter of law. The grounds and authorities for Plaintiff's Motion for Summary Judgment (the "Motion") are set forth in the accompanying Memorandum of Law.

WHEREFORE, the Plaintiff respectfully requests that the Court grant the Motion and any other relief that this Court deems just and proper.

*/s/ Brian S. Goodman*
Brian S. Goodman (03212)
Goodman & Donohue, LLC
9199 Reisterstown Road, Suite 213C
Owings Mills, Maryland 21117
brian@goodmandonohue.com
(443) 824-0659 Telephone
(443) 957-9032 Facsimile

*Attorney for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### (Southern Division)

| | | |
|---|---|---|
| **MITCHELLVILLE PLAZA BAR LP** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No.** |
| | ) | **8:21-CV-00106-PWG** |
| | ) | |
| **THE HANOVER AMERICAN** | ) | |
| **INSURANCE COMPANY** | ) | |
| | ) | |
| **Defendant.** | ) | |

_____

### PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Plaintiff Mitchellville Plaza Bar LP, by its undersigned counsel and pursuant to Fed. R. Civ. P. 56, files this Memorandum in Support of its Motion for Summary Judgment (the "Motion"):

### I.   Introduction

This case arises out of the defendant insurer's failure to pay Plaintiff Mitchellville Plaza Bar LP's ("Mitchellville") first party claim for damage to the roof at its property in Maryland. When defendant The Hanover American Insurance Company ("Hanover") denied coverage, it did so after completing only a minimal investigation that did not substantiate its reliance on the exclusionary language stated in its denial letter.—the stated basis for its denial was an exclusion for damage caused by nesting or infestation or discharge or release of waste products by birds, rodents or other animals, yet while its expert report opined that the damage was likely caused by turkey vultures, it did not

1

conclude that the roof damage was a result of nesting, an infestation, or the waste products of the turkey vultures. Rather, the report states only that the damage was done by "an animal chewing or bird pecking on the edges of the membrane." Because of this denial, Mitchellville was forced to bear the entire cost of its roof repair.

Discovery has further revealed that not only did Hanover not obtain an expert opinion or evidence to support a conclusion that the damage was caused by nesting or infestation, but Hanover failed to pursue such evidence even after it was advised to do so when seeking advice concerning the exclusion in question, about which there is very little case law, from a prominent insurance thinktank. And even now, when the only expert opinion concerning the source of the roof damage is that it was <u>not</u> caused by nesting or infestation, Hanover still refuses to move off its denial.

Accordingly, Mitchellville seeks summary judgment with respect to both Hanover's breach of contract and its violation of the Pennsylvania bad faith statute.

## II.   <u>Statement of Undisputed Facts</u>

1.      Hanover issued an all-risk property insurance policy to Waynesboro GF LP for the policy year June 17, 2019, through June 17, 2020 (the "Policy"). *See* Ex. 1-Relevant Insurance Policy Excerpts at 1.[1]

2.      The Policy covers several business locations, including a building located at 12164 Central Avenue in Mitchellville, Maryland (the "Property"). *Id*. at 11.

---

[1] By agreement of counsel via email exchange on October 28, 2021, the parties do not dispute the admissibility of any exhibits used in this Motion, the Memorandum in Support, or any response thereto, and acknowledge that they are fair and accurate representations of materials in the record. *See* Fed. R. Civ. P. 56(c)(2).

3.      The Policy provides blanket building coverage with a limit of $50,626,938 for damage "to Covered Property . . . caused by or resulting from any Covered Cause of Loss." *Id*. at 5, 17. As stated in the Cause of Loss-Special Form, "Covered Causes of Loss means direct physical loss unless the loss is excluded or limited in this policy." *Id*. at 32. As such, the Policy covers all perils unless **explicitly excluded**. *See id*. This is an "All Risk" policy. *See* Ex. 2- Stevens Depo[2]. at 37:1-5.

4.      Mitchellville discovered extensive damage to the roof of the Property and timely reported the damage to Hanover on May 15, 2020. *See* Ex. 17- Hanover Claim Notes at 2. Hanover opened the claim file that same day. *See* Ex. 3- White Depo. at 45:17- 46:2.

5.      Hanover hired Jason Phillips of Together We'll Make It Right Bylt LLC to inspect the roof and Mr. Phillips provided a brief report dated June 1, 2020, indicating that "When arriving onsite we saw numerous large birds that were perched on the roof, accessories and nearby light posts. Documentation of bird droppings were documented in areas of damage to accessories. It appeared the birds perched on these items and caused them to loose [sic] integrity of pipe jacks causing water intrusion in several areas." *See* Ex. 4- Bylt Report at 3; *see also* Ex. 3- White Depo at 46:14-21.

6.      Hanover also hired a structural engineer, Peter Malmquist, to inspect the damage. Mr. Malmquist wrote what is known as the Donan Report, dated July 21, 2020,

---

[2] As required by order of the Court, Plaintiff has provided the entire deposition manuscript. Certain portions of this deposition, however, discuss materials protected by the stipulated confidentiality agreement so those lines have been redacted. The redacted portion is not relevant for this motion, but if the Court wishes to see a fully unredacted version of this transcript, Plaintiff is happy to provide it for in camera review upon request.

in which he concluded, based on a visual inspection and a conversation via telephone with the insured, that "The cause of the tears in the roof membrane is consistent with an animal chewing or bird pecking on the edges of the membrane." *See* Ex. 5 - Donan Report at 2; *see also* Ex. 6.- Malmquist Depo. at 18:1-5.

7.      Hanover was also provided by the insured with a "Roof Condition Report" from Peach State Roofing ("PSR") that contained photos of the roof and detailed the damage, which PSR concluded was caused by birds, including a caption indicating that "EPDM Membrane damaged from birds. PSR believes the birds are using the rubber for their nests." *See* Ex. 7.- Peach State Roofing Report at HAN0256; *see also* Ex. 3- White Depo. at 35:17-36:1.

8.      PSR is not an expert concerning birds or bird behavior. *See* Ex. 8- Faircloth Depo. at 34:3-13.

9.      Hanover denied coverage for the claim in a letter dated July 30, 2020. *See* Ex. 9 - Hanover 7/30/20 Denial Letter. The only basis for the denial is the following exclusion:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
> (5)   **Nesting or infestation, or discharge or release of waste products or secretions**, **by** insects, **birds**, rodents, or other animals. [emphasis added]

*Id*.; *see also* Ex. 2- Stevens Depo. at 12:10-17.

10.      Mitchellville challenged the denial in a letter dated September 11, 2020, arguing that the Donan Report did not state or suggest that the birds that purportedly

4

chewed or pecked the roof were nesting or that there was a bird infestation. *See* Ex. 10-Hanover 10/29/20 Denial Letter.

11.     As part of its investigation to reevaluate the denial, Hanover submitted a coverage question to the Property & Liability Resource Bureau ("PLRB"), a database of coverage analysis and a think tank for insurance carriers. *See* Ex. 11 - Hanover Claim Notes re: Communication with PLRB at HAN0273-76; Ex. 2- Stevens Depo. at 16:9-17:10. In its response, the PLRB raised questions concerning the scope of the exclusion, suggested that the facts do not appear to indicate that the birds were nesting, and suggested Hanover retain an expert to further evaluate whether the presence of the birds constituted an infestation. *See id*.

12.     Despite this advice, Hanover did not complete any further factual investigation or retain an expert concerning bird behavior or turkey vultures. *See* Ex. 3 - White Depo. 34:20-35:4*;* 37:10-14; Ex. 2 - Stevens Depo. 22:5-15; 42:13-43:14.

13.     Hanover sent a letter dated October 29, 2020, reasserting its denial on the same grounds stated in its previous letter without providing further evidence or explanation as to how it reached its conclusion that the birds were nesting and/or constituted an infestation. *See* Ex. 10 - Hanover 10/29/20 Denial Letter.

14.     Mitchellville's ornithological expert (the only ornithological expert who will testify in this case), Dr. Samantha Carouso-Peck, confirmed that the damage to the roof was **not** caused by nesting behavior or an infestation of vultures. Rather, Dr. Peck has opined that "that the damage to the roof was caused by pecking or shredding of the roof's protective membrane by the beaks of turkey vultures," likely "a small number of

passing turkey vultures temporarily using the roof as a perching site." *See* Ex. 12 - Dr.

Peck's Expert Report at 2.

15.     In her deposition Dr. Peck acknowledged that vultures caused the damage,

but that there is no evidence of a vulture infestation:

> Q.     Okay. So, we're back to Exhibit Number 3, your report. I'm showing Pages it looks like 4 and 5, and your Number 13 states: The membrane damage was most likely caused by one or a few vultures in a brief acute incident or sequence of incidents.  Why do you say that?
>
> A.     I say that because the area around the membranes, the area which I can see in the photographs, as well as the areas that you showed me in all of the subsequent photographs today, simply is not -- does not show evidence of long-term residence by vultures.  I absolutely concede that a number of vultures, 15 to 25, perched on that roof, perhaps with some regularity, and there was some vulture feces on that roof.  However, nowhere near the quantity either in terms of numbers of vultures or amount of feces, regurgitate, feathers, et cetera, that one would expect of a vulture roost or a vulture infestation.

*See* Ex. 13 - Dr. Samantha Carous-Peck Depo. 107:10-108:11.

16.     Mitchellville completed the roof repair by replacing two sections of the

roof at a cost of $219,569. *See* Ex. 14- Peach State Roofing Invoice.

a.  Hanover's expert, Joshua Payne, agreed in his deposition that the cost of

$124,750 to replace Section 2 of the roof was reasonable and warranted.

*See* Ex. 15 - Payne Depo. 19:3-20:5; 28:1-13.

b. Mr. Payne further indicated that he needed more information to opine whether full replacement of Section 3 was warranted.[3]  He confirmed that the $94,819 cost of replacement, if justified, was reasonable. *Id*. at 21:8- 22:2; 29:4-17.

17.     Hanover continues to assert that its coverage denial was appropriate and has not paid any amount towards Mitchellville's claim for the damage to its roof. *See* Ex. 2- Stevens Depo. 46:10-14.

## III.     <u>Summary Judgment Standard</u>

Rule 56 requires that a party seeking summary judgment show "that there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a party carries this burden, then the court will award summary judgment unless the opposing party can identify specific facts, beyond the allegations or denials in the pleadings, that show a genuine issue for trial. Fed. R. Civ. P. 56(e)(2). To carry these respective burdens, each party must support its assertions by citing specific evidence from the record. Fed. R. Civ. P. 56(c)(1)(A). The court will assess the merits of the motion, and any responses, viewing all facts and reasonable inferences in the light most favorable to the opposing party. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008).

---

[3] Mitchellville has provided additional information and has not heard further concerning Mr. Payne's opinion, despite inquiring with Hanover's counsel.

**IV.** **Argument**

    **A. Hanover breached the insurance contract when it wrongfully denied coverage.**

        **i. As a threshold matter, there is no conflict between Maryland and Pennsylvania law with respect to contract interpretation.**

A federal court sitting in diversity applies the choice of law rules of the forum state in which it sits. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Accordingly, the Court will apply Maryland choice of law rules to determine which state's law governs the Policy.

Maryland courts generally follow the rule of *lex loci contractus*, applying the law of the jurisdiction where the contract was made unless the contract contains a choice-of-law provision. *Allstate Ins. Co. v. Hart*, 327 Md. 526, 529 (Md. 1992); *Am. Motorists Ins. Co. v. ARTRA Group Inc.*, 338 Md. 560, 573 (Md. 1995). Typically, the state in which an insurance contract is made is the state in which the policy is delivered, and premiums are paid. *Cooper v. Berkshire Life Ins. Co.*, 148 Md. App. 41, 55 (Md. Ct. Spec. App. 2002).

The Policy was issued to the first named insured in Pennsylvania, *see* Ex. 1- Policy Excerpts at 1, and the premiums were paid from Pennsylvania, which is the location of the headquarters for both the first named insured and Plaintiff Mitchellville. *See* Ex. 16- Affidavit of Robert Gothier. Thus, Pennsylvania law should apply to the Policy. Nonetheless, because the dispute involves the application of the Policy to a loss sustained in Maryland, Hanover contends that the limited choice of law *renvoi* exception should apply and the dispute decided pursuant to Maryland law. *See* ECF 14-1- Memorandum in Support of Hanover's Motion to Dismiss Count II at 4.

A choice of law analysis is only necessary, however, if the interpretation of the policy would be different depending on which state's law applies. *See Mallinckrodt, Inc. v. Whittaker M.A. Bioproducts Inc.*, 81 Md. App. 96, 103 (Md. Ct. Spec. App. 1989); *Jiffy Lube Intern., Inc. v. Morgan*, 7 F.3d 224 n.3 (4th Cir. 1993). Here there is no conflict because under either Maryland or Pennsylvania law, Hanover, as the insurer, bears the burden of proving the exclusion to coverage and ambiguity in the exclusionary language is construed against it.

Under Pennsylvania law, the burden is on the insured to "show that the policy covers its claim, and then the burden shifts to the insurer to establish an exclusion." *Butterfield v. Giuntoli*, 670 A.2d 646, 651-52 (Pa. Super. Ct. 1995) (citations omitted). "Exclusionary clauses generally are strictly construed against the insurer and in favor of the insured." *Peters v. Nat'l Interstate Ins. Co.*, 108 A.3d 38, 43 (Pa. Super. Ct. 2014).

"When the language of the policy is clear and unambiguous, [the court] must give effect to that language. Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S, Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006).

As in Pennsylvania, under Maryland law, the insured has the burden of establishing that an injury is within the scope of coverage and once that burden is met, the burden then shifts to the insurer to establish that an exclusion removes its duty to indemnify. *White Pine Ins. Co. v. Taylor*, 165 A.3d 624, 633 (Md. Ct. Spec. App. 2017).

9

The Court of Special Appeals has explained that:

> Maryland does not follow the rule of many other states that insurance policies are generally construed against the insurance company. Nevertheless, **"any ambiguity will be 'construed liberally in favor of the insured and against the insurer as drafter of the instrument.'"** *Md. Cas. Co. v. Blackstone Int'l Ltd.*, 442 Md. 685, 695 (2015) (quoting *Dutta v. State Farm Ins. Co.*, 363 Md. 540, 556-57, 769 A.2d 948 (2001)); *accord Empire Fire & Marine Ins. Co. v. Liberty Mut. Ins. Co.*, 117 Md. App. 72, 97-98, 699 A.2d 482 (1997). As the Court of Appeals noted in *Megonnell v. United Servs. Auto. Ass'n.*, we interpret exclusionary provisions within insurance contracts narrowly. 368 Md. 633, 656, 796 A.2d 758 (2002) (quoting Eric Mills Holmes & Mark S. Rhodes, Holmes's Appleman on Insurance, 2d 276-81 (Eric Mills Holmes ed., vol. 2 § 7.2, West 1996)). **"[S]ince exclusions are designed to limit or avoid liability," limitations on coverage must be construed strictly and narrowly and "in favor of a finding of coverage."** *Id.* **The insurer, therefore, as the drafter of the agreement, must draft the language of an exclusion "conspicuously, plainly and clearly" and "clearly set forth" any limitation on coverage to the insured.** *Id.* **Moreover, "[a]n exclusion by implication is legally insufficient."** *Id.*

*Id.* at 635 (emphasis added); *see also People's Insurance Counsel Division v. State Farm Fire & Casualty Co.,* 109 A.3d 1208, 1213 (Md. 2015) (J. Adkins dissenting) ("No one questions that Maryland abides by the 'construe against the drafter' principle of contract interpretation. *See Sullins v. Allstate Ins. Co.*, 340 Md. 503, 508-09, 667 A.2d 617, 619 (1995). And the insurance company is always the drafter.")

It does not appear that there is a true conflict between Pennsylvania and Maryland with respect to general principles of insurance policy construction and where the burdens lie. Moreover, neither State has any law concerning the exclusion at issue, and while Maryland does not generally construe insurance contracts against insurers, both Maryland and Pennsylvania construe ambiguities, particularly ambiguities in exclusionary

language, against insurers. *See MAMSI Life & Health Ins. Co. v. Callaway*, 825 A.2d 995, 1005-06, 375 Md. 261, 280 (Md. 2003) ("[W]hen a term in an insurance policy is found to be ambiguous, the court will construe that term against the drafter of the contract which is usually the insurer.").

The question, then, is whether Hanover has met its burden to exclude coverage by demonstrating that the claimed loss was for "damage caused by or resulting from . . . Nesting or infestation, or discharge or release of waste products or secretions, by . . . birds. . ." **The Policy does not exclude coverage for Mitchellville's loss, so the denial was improper and Hanover breached the contract.**

Hanover's denial was based solely on the following exclusion:

> 2. We will not pay for loss or damage caused by or resulting from any of the following:
>
>  (5)  Nesting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents, or other animals.

*See* Ex. 1- Policy Excerpts at 34; *see also* Ex. 2- Stevens Depo. at 12:10-17.

As applied here, the claim for the roof damage would be excluded only if the damage was caused by the turkey vultures nesting, a turkey vulture infestation, or by the turkey vultures' droppings. Consistent with a narrow reading of the exclusion, if the loss was caused by other actions of the turkey vultures that do not fall into one of these three categories, it would not be excluded.

The Policy does not define the terms "nesting" or "infestation" and the case law on the exclusion is sparse and not instructive with respect to the facts here. Though it is

undisputed that birds were present on the roof and were pecking at the roof membrane, the only ornithological expert who will testify, Dr. Samantha Carouso-Peck, is abundantly clear that this damage was **not** caused by nesting, infestation, or release of waste products or secretions.

With respect to nesting, Dr. Peck opined in her expert report that "Vultures were not nesting on the roof." *See* Ex. 12.- Peck Report at 2. In her deposition, Dr. Peck further explained:

> If any roof is used for any amount of time as a nesting site or a roosting site by any species of American vulture, it will be incredibly obvious.

> With utmost love for vultures, they are disgusting. A group of more than five vultures on a roof for an hour will leave acidic white stains from their feces smeared all across the roof. It will corrode the metal. It's a terrible danger to people who work on telephone poles because it can eat right through the metal. They will defecate and regurgitate on their legs to keep cool on hot days, and they will regurgitate next to their chicks instead of into their mouths. They are filthy. It truly only took me one look at the photos of the roof to determine there is not any chance within a reasonable degree of scientific certainty that vultures have ever used that space as a roost or a nesting site.

*See* Ex. 13.- Peck Depo. at 65:18-66:18.

Hanover itself does not appear to strongly rely on the nesting portion of the exclusion. The only evidence of nesting that Hanover's claims representative, Kenneth White, pointed to in support of the denial was the caption in the report from Peach State Roofing that read "EDPM membrane damage from birds, PSR believes the birds are using the rubber for their nests." *See* Ex. 3- White Depo. at 35:12-36:10.

Further, Hanover stated in its October 29, 2020, denial letter that "Turkey vultures do not build nests, but rather lay their eggs in dark recesses in ledges, caves, crevices, and

hollow logs, as well as on the ground. Turkey Vultures also nest in the abandoned stick nests of birds, in mammal burrows, and in abandoned buildings." *See* Ex. 10- 10/29/20 Denial Letter. This quotation was taken from advice Hanover received from PLRB in response to an inquiry about the policy exclusion. PLRB further advised, with respect to nesting "if there is no indication that the birds have built a nest or lay [sic] any nest on site, or alternatively as an effort to treat the roof as the birds' abode, the nesting exclusion would arguably be inapplicable to these facts." *See* Ex. 11- Hanover Claim Notes re: Communication with PLRB at HAN0274-75.

The roof at the insured's premises is not on an abandoned building and there is no evidence that anyone observed nests or eggs laid in any recesses of the roof. Additionally, though the non-bird expert PSR roofer suggested that the birds were using the rubber for their nests, the research cited by Hanover indicated that turkey vultures do not in fact build nests. Even if we assume arguendo that they were gathering the rubber for nests elsewhere, it is undisputed that they were not building nests on this roof. Accordingly, and consistent with the advice Hanover received from the PLRB, there is no basis to support a denial based on the nesting portion of the exclusion.

With respect to infestation, Dr. Peck's expert report states that "The membrane damage was most likely caused by one or a few vultures in a brief, acute incident or sequence of incidents. The activity of birds on the building did not constitute an 'infestation'." *See* Ex. 12.- Peck Report at ¶ 5.

Dr. Peck further explained:

Q. Is it your opinion that only a small number of -- and I'm just going to say vultures, since we're not certain on black or turkey at this point. So, is it your opinion that only a small number of vultures caused the damage to the roof?

A. That is my opinion.

Q. And what's the basis for that opinion?

A. The basis for that opinion is that if a large number of vultures had ever been present around that membrane for any amount of time greater than I'd say an hour, there would be very obvious visual signs of the damage that they cause.

Q. And what would those signs be?

A. Those would be considerable streaks of white feces with uric acid, regurgitation -- that is, rotting meat and stomach acid -- feathers in large quantities -- they molt a lot -- and potentially remains of animals, small bones and skulls. As I said, they're extremely messy animals.

Q. And you did not see signs of that in the two photographs you reviewed?

A. That's correct.

Q. What is your opinion on what a large number of vultures would be?

A. I would say a large number of vultures would be a roost of vultures. That is to say, every night vultures choose a place to communally aggregate and roost, typically in a tree. But certainly, a roof wouldn't be out of the question. And they will gather in large mixed-species flocks -- that is of both turkey and black vultures -- in hundreds and thousands of individuals. They do not roost in small groups. They like to be together. But they're pretty solitary while foraging. Typically, turkey vultures will forage on their own. Black vultures will forage in groups of three to five.

Q. Do you consider 15 vultures a small number or a large number?

A. That would be a small number of vultures.

Q. 25 vultures, is that a small number or a large number?

A. I would still consider that a small number of vultures.

Ex. 13- Peck Depo. at 72:11-73:20.

* * *

14

Q. Is it your opinion that the vultures were not on the roof for a long period of time?

A. Yes. Given my knowledge of vulture behavior and movement, vultures are very nomadic, as I said previously. They do not tend to stay in one place for very long. They spend most of their days circling and hunting for food. They will perch to rest for brief periods of time but never for very long. They need to keep moving and eating. And at night, as I said, they will roost in large communal roosts of hundreds and thousands of birds, typically far away from human activity.

*Id.* at 75:18 - 76:11.

* * *

A. I believe I understand your question, so let me clarify. Vultures will absolutely return to the same place to perch if it's a convenient place to perch, usually for not more than a few minutes, maybe an hour at a time perching. I think if vultures were nesting or roosting in a location that would be a multi-month-long process, which I think you could argue means that they are resident in that area and therefore could constitute an infestation. These birds, there's no evidence I could see that in this case the birds were nesting or roosting on that roof, but were using it as a perching site in small numbers for not more than an hour at a time would be my guess, although I'm sure birds were coming in and out and there could have been overlap between individuals coming and departing.

Q. Okay. So, if birds were perching on that roof for a span of a month, would you consider that long term?

A. I would say that those birds are not resident. I believe in my report I did some sort of comparison to if a herd of buffalo regularly run across your property and run into your wall and destroy it, that is action of a large group of animals causing damage to a property but does not constitute an infestation because the buffalos are not resident. They keep coming and damaging your property, but they are not infesting.

*Id.* at 77:2 - 78:15.

Hanover, however, contends that the mere presence of an unknown number of vultures pecking at the roof on a recurring basis should be considered an infestation. *See* Ex. 2- Stevens Depo. at 13:2-14:16; 23:3-13. In fact, Hanover's claims manager

expressly stated that "[t]he exclusion is basically the repeated bird activity," despite the actual policy language being more narrowly drawn. *See id.* at 24:2-25:4

Hanover maintained its position after Mitchellville first challenged the denial, despite receiving advise from the PLRB that:

> A reasonable argument could be made that the term "infestation" should be limited to a loss caused by a group of turkey vultures, as opposed to damage caused by one turkey vulture. In general, courts have limited the infestation exclusion to losses involving hundreds if not thousands of one kind of animal, such as mites, termites, bats or rats. Since Photograph 5 within the report shows what appear to be three turkey vultures perched on the north parapet of the insured's building, there seem to be more than one turkey vultures present on the roof of the building. **But how many turkey vultures would be sufficient to constitute an infestation? This is unclear. Perhaps consultation with an expert might help clarify what constitutes an infestation of turkey vultures.** For instance, this page from the Turkey Vulture Society blog states that "Vultures are highly social animals that prefer to roost in large colonies." If this is accurate, it is possible that a large colony of turkey vultures have been roosting on top of the building. In such a situation, it is arguable that there has been an infestation of (and potentially also nesting of) the turkey vultures, thus bringing the loss under this exclusion.

Ex. 11- Hanover Claim Notes re: Communication with PLRB at 0275 (emphasis added).

Hanover never obtained expert advice or tried to ascertain how many turkey vultures might constitute an infestation, but instead ostensibly relied on eyewitness accounts and photographs of no more than five turkey vultures perched on the roof. Hanover admits that no witness observed or photograph evidenced hundreds or thousands of turkey vultures on the roof and agrees that no number was placed on how many were observed by Bylt Construction or Donan. *See* Ex. 2- Stevens Depo. at 31:6-32:11; 33:1-34:7.

Though the PLRB advice suggested that a colony roosting on the building could be an infestation, Hanover has provided no evidence that the turkey vultures perched on the roof were in such numbers so as to make up a colony that had taken up residence on the roof, and thus Hanover has no basis to assert that there was an infestation sufficient to trigger the coverage exclusion.

Even if, however, the Court finds reasonable Hanover's determination that the small number of turkey vultures observed by eyewitnesses was an infestation, when contrasted with the expert opinion offered by Dr. Peck that such a small number of birds is not an infestation of turkey vultures, simply demonstrates that the policy term is ambiguous under the circumstances because there exist at least two reasonable interpretations of the undefined term "infestation." The PLRB advice further highlights this problem, stating that it is unclear how many turkey vultures would constitute an infestation.

"Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.'" *401 Fourth St. v. Investors Ins. Group*, 879 A.2d 166, 172, 583 Pa. 445 (Pa. 2005) (internal citations omitted); *see also State Farm Mut. Auto. Ins. Co. v. DeHaan*, 393 Md. 163, 193, 900 A.2d 208 (2006) ("If the language in an insurance policy suggests more than one meaning to a reasonably prudent layperson, it is ambiguous.") (quoting *Sullins*, 340 Md. at 508–09 (1995)).

And, as stated above, "when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of

17

indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner*, 908 A.2d at 897; *see also Callaway*, 825 A.2d at 1005-06, 375 Md. at 280.

Thus, if the Court is faced with more than one reasonable interpretation of the term infestation, it is compelled to construe that ambiguity against Hanover as the insurer and in Mitchellville's favor. After all, it is within Hanover's power to draft its policy language to define exactly what it means by an infestation and to make clear if it intends to exclude the type of damage at issue here, i.e., damage caused over time by repeated bird activity but which might not amount to an infestation.

Finally, with respect to the final part of the exclusion, no one has indicated that the damage to the roof was caused by or resulted from the "discharge or release of waste products or secretions" by the turkey vultures. Hanover's own expert opined that "The cause of the tears in the roof membrane is consistent with an animal chewing or bird pecking on the edges of the membrane," *see* Ex. 5 - Donan Report at 2, and Mitchellville's expert agreed. *See* Ex. 12- Peck Expert Report at 2 ("The damage to the roof membrane was caused by the beaks of birds."). Hanover's claims manager attempted to support the secretion part of the exclusion by stating that the Bylt report observed bird droppings on the roof, *see* Ex. 2- Stevens Depo. at 38:20-39:2, but no one ties the presence of bird droppings to the actual damage the roof sustained, which was principally tearing of the roof membrane. Accordingly, there is no evidence to support a denial based on the waste products or secretions portion of the exclusion.

As Hanover cannot as a matter of law demonstrate that the loss is excluded from coverage, the court should find that it has breached its contract by denying coverage, grant summary judgment in Mitchellville's favor for Count I of the Complaint, and award Mitchellville the reasonable cost incurred to replace its roof.[4]

### B.  Hanover's coverage denial was and continues to be in bad faith.[5]

Pennsylvania's bad faith statute, set forth in 42 Pa.C.S.A. § 8371, provides that:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.

"[T]o prevail in a bad faith insurance claim pursuant to Section 8371, a plaintiff must demonstrate, by clear and convincing evidence, (1) that the insurer did not have a

---

[4] Mitchellville paid $219,569 to replace two sections of its roof. It is undisputed that the $124,750 paid to replace Section 2 of the roof was reasonable, related and warranted. *See* Ex. 15 - Payne Depo. 19:2-20:5; 28:1-13. The only amount contested at this point is the $94,819 paid to replace Section 3, which Hanover's expert concedes is a reasonable amount but has requested further information, which was provided, to evaluate whether full replacement of this section was warranted. *Id.* at 21:8- 22:2; 29:4-17. The parties can further discuss the appropriate amount to recoup Mitchellville for the damage to Section 3 or contest it at a hearing on damages if necessary.

[5] Currently pending is Defendant Hanover's motion to dismiss count II, the count for bad faith, which Mitchellville has pleaded under the Pennsylvania bad faith statute, 42 Pa.C.S.A. § 8371. Hanover seeks dismissal, as it contends that Maryland law, not Pennsylvania law, applies to its claims handling. The parties have briefed the choice of law issue, *see* docket entries 14, 17, 18. Should the Court determine that Maryland law applies and dismiss the count for bad faith, Mitchellville will seek to amend the complaint to state its claim under the Maryland bad faith statute, Md. Cts. & Jud. Proc. § 3-1701. The Court previously indicated it would permit this, and the parties have taken discovery on bad faith, so such an amendment would not be prejudicial

reasonable basis for denying benefits under the policy and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis in denying the claim." *Rancosky v. Wash. Nat'l Ins. Co.*, 170 A.3d 364, 377 (Pa. 2017).

The first prong of this test "is an objective inquiry into whether a reasonable insurer would have denied payment of the claim under the facts and circumstances presented." *Rancosky*, 170 A.3d at 374 (citing *Anderson v. Continental Ins. Co.*, 85 Wis.2d 675, 271 N.W.2d 368, 377 (1978)).

With respect to the second prong, "proof of the insurer's knowledge or reckless disregard for its lack of reasonable basis in denying the claim is sufficient for demonstrating bad faith..." *Rancosky*, at 377. It is not necessary for the plaintiff to prove that the insurer had a "subjective motive of self-interest or ill-will." *Id*.

The "clear and convincing" standard is high, requiring a plaintiff to show that the evidence is so "clear, direct, weighty and convincing as to enable a clear conviction, without hesitation, about whether or not the defendants acted in bad faith." *J.C. Penney Life Ins. Co. v. Pilosi,* 393 F.3d 356, 367 (3d Cir. 2004) (internal quotation omitted).

As discussed in part A.ii., the evidence is clear and direct that Hanover had no basis to deny coverage based on the nesting or waste products and secretions portion of the policy exclusion, as there was zero evidence linking bird droppings to the claimed damage, and similarly no evidence that the turkey vultures were nesting on the roof or were using the rubber membrane to build nests, as Hanover's own research in fact stated that turkey vultures do not build their own nests.

That leaves the infestation portion of the exclusion as Hanover's only potentially reasonable basis for denying coverage. The only evidence, however, that there was an "infestation" were photographs of no more than 5 birds on the roof at a time and eyewitness accounts from Hanover's investigators that some unknown number of birds were present on the roof: the Bylt report states "we saw numerous large birds that were perched on the roof, accessories, and nearby light posts" and the Donan report recounted a telephone call with the insured, who stated that "they had patched the roof membrane, but the birds (buzzards) keep tearing off the patches."

This evidence is very thin to provide a reasonable basis to deny coverage, especially as Hanover has the legal burden to prove an exclusion and is legally required to narrowly construe an exclusion to coverage. After all, the exclusion is for an "infestation," not general repeated bird activity, as Hanover's claim manager contends. *See* Ex. 2- Stevens Depo. at 24:2-25:4.

Once Mitchellville pushed back on the initial denial and Hanover sought advice from the PLRB, any illusion that it had a reasonable basis to deny coverage based on the infestation exclusion was shattered. Once it proceeded to issue the second denial letter without having done any further investigation, the evidence is clear and direct that Hanover knew, or recklessly disregarded, that it lacked a reasonable basis to stand on the denial because the PLRB told it so—the PLRB agreed that damage caused by a group of birds could reasonably be an infestation, but explicitly inquired how big such a group would need to be, suggesting that a group the size of a colony would be sufficient, and

positing that consultation with an expert could help clarify this question. *See* Ex. 11 - Hanover Claim Notes re: Communication with PLRB at 0275.

Despite this direct advice, Hanover performed no further investigation and denied coverage for the same reasons asserted in its initial denial. *See* Ex. 2- Stevens Depo. at 22:5-25:8; Ex. 3 - White Depo. 34:20-35:4. And Hanover's initial (and only) investigation showed fewer than ten birds on the roof at a time, nothing close to a group of birds the size of a colony. Mitchellville's ornithological expert has echoed the PLRB by suggesting a colony roosting could be an infestation but has also stated there is absolutely no evidence here to suggest that this is what was happening on Mitchellville's roof. *See* Ex. 13- Peck Depo. at 72:11-74:20.

In the face of mounting evidence that is denial is unreasonable, however, Hanover continues to stand on it. Hanover's conduct is in bad faith and in addition to the reasonable cost to replace the damaged roof, Mitchellville respectfully requests that the Court order Hanover to pay interest from the date of the claim and Mitchellville's court costs and attorney's fees[6].

## V.   <u>Conclusion</u>

For the foregoing reasons, Mitchellville respectfully requests that this Court grant summary judgment in its favor as to both counts of its complaint.

---

[6] Mitchellville's counsel will provide whatever supplemental materials or briefing are requested by the Court to aid it in calculating these amounts. Plaintiff notes that it has the right to request punitive damages under the Pennsylvania statute, but at this time and for purposes of this motion Plaintiff is not seeking this relief but reserves the right to do so at trial. *See Rancosky*, 170 A.3d at 376 ("as Section 8371 does not distinguish between the standard for finding 'bad faith' generally and 'bad faith' allowing for punitive damages, we find no basis for concluding that the General Assembly intended to impose a higher standard of proof for bad faith claims seeking punitive damages when it created the right of action").

Respectfully submitted,


/s/ Brian S. Goodman
Brian S. Goodman (03212)
Goodman & Donohue, LLC
9199 Reisterstown Road, Suite 213C
Owings Mills, Maryland 21117
brian@goodmandonohue.com
(443) 824-0659 Telephone
(443) 957-9032 Facsimile

*Attorney for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I CERTIFY that on this 1st day of November 2021, copies of the Motion for Summary Judgment, Plaintiff's Memorandum in Support of its Motion for Summary Judgment, and proposed Order were electronically served using the court's CM/ECF system on

> Alicia D. Stewart, Esquire
> Downs Ward Bender Hauptmann & Herzog, P.A.
> Executive Plaza III, Suite 400
> 11350 McCormick Road
> Hunt Valley, Maryland 21031
> ***Attorneys for Defendant***

> */s/ Brian S. Goodman*
> Brian S. Goodman