**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **MITCHELLVILLE PLAZA BAR LP,** | * | |
| **Plaintiff,** | * | |
| **v.** | * | **Case No.: PWG 21-cv-106** |
| | * | |
| **THE HANOVER AMERICAN** | | |
| **INSURANCE COMPANY,** | * | |
| **Defendant.** | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

<u>**MEMORANDUM OPINION**</u>

Pending before me is Defendant The Hanover American Insurance Company's ("Hanover") Motion to Dismiss Count II of Plaintiff Mitchellville Plaza Bar, LP's ("Mitchellville") Complaint. ECF 14, MTD. Count II of Mitchellville's Complaint asserts a cause of action for Bad Faith under Pennsylvania's bad faith statute, codified at 42 Pas. C.S.A. § 8371. ECF 1, Compl. at ¶¶ 22–32. Hanover moves to dismiss Count II under Fed. R. Civ. P. 12(b)(6) because, it argues, Maryland law applies to this dispute and Pennsylvania's bad faith statute is therefore inapplicable. MTD at 3–4. I have reviewed the filings[1] and find that a hearing unnecessary. *See* Loc. R. 105.6 (D. Md. 2021). Because I conclude that Pennsylvania law applies in this case, Hanover's Motion is DENIED.

Because I deny Hanover's Motion to Dismiss, I will proceed directly to considering the Parties' Cross-Motions for Summary Judgment, which are also fully briefed.[2] No hearing is

---

[1]    MTD; ECF 17, Opp.; ECF 18, Reply.

[2]    ECF No. 30, Mitchellville MSJ; ECF No. 31, Hanover Opposition to Mitchellville's MSJ and Cross-Motion for Summary Judgment ("Hanover MSJ"); ECF No. 34, Mitchellville Opposition to

necessary to resolve the Summary Judgement Motions. *See* Loc. R. 105.6 (D. Md. 2021). For the

reasons explained below, Mitchellville's Motion for Summary Judgment is DENIED and

Hanover's Motion for Summary Judgment is GRANTED.

## I.    HANOVER'S MOTION TO DISMISS

### A.    Background

This action arises out of Hanover's alleged failure to pay for a covered loss under the

insurance policy it issued to Waynesboro GF LP ("Policy"), which provides blanket building

coverage of up to $50,626,938 for damage to covered property. Compl. ¶ 7. Specifically,

Mitchellville alleges that Hanover improperly refused to cover the "extensive damage" to the roof

of the building located at 12164 Central Avenue in Mitchellville, which is identified as covered

property under the Policy (the "Property"). *Id.* A report prepared by a forensic engineer at

Hanover's request determined that the damage to the roof was "consistent with an animal chewing

or bird pecking on the edges of the membrane." *Id.* ¶¶ 10–12. The report included photos of birds

on the roof of the building and noted that the author had been informed that "buzzards" had been

tearing off patches on the roof. *See* ECF 1-2, Malmquist Report. In light of that report, Hanover

denied coverage under a Policy term that specifically excludes coverage for damage caused by

"nesting or infestation, or discharge or release of waste products or secretions by insects, birds,

rodents, or other animals." Compl. ¶ 14.

Mitchellville filed this action for Breach of Contract (Count I) and Bad Faith (Count II) on

January 12, 2021. Compl. Hanover now moves to dismiss Count II of Mitchellville's Complaint,

---

Hanover's MSJ and Reply in support of its MSJ ("Mitchellville Reply"); ECF No. 35, Hanover's Reply in
support of its MSJ ("Hanover Reply")

which it filed pursuant to Pennsylvania's bad faith statute, 42 Pa. C.S.A. § 8371, because it contends that Maryland law applies.

### B. Standard of Review

Federal Rule of Civil Procedure 12(b)(6) provides for "the dismissal of a complaint if it fails to state a claim upon which relief can be granted." *Velencia v. Drezhlo*, No. RDB-12-237, 2012 WL 6562764, at *4 (D. Md. Dec. 13, 2012). This rule's purpose "'is to test the sufficiency of a complaint and not to resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'" *Id.* (quoting *Presley v. City of Charlottesville*, 464 F.3d 480, 483 (4th Cir. 2006)). To that end, the Court bears in mind the requirements of Rule 8, *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) when considering a motion to dismiss pursuant to Rule 12(b)(6). Specifically, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a)(2), and must state "a plausible claim for relief," as "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice," *Iqbal*, 556 U.S. at 678–79. *See Velencia*, 2012 WL 6562764, at *4 (discussing standard from *Iqbal* and *Twombly*). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 663.

### C. Analysis

The sole issue presented in Hanover's Motion to Dismiss is whether Maryland's bad faith statute, Md. Code, Cts. & Jud. Proc. § 3-1701, or Pennsylvania's, 42 Pa. Stat. and Cons. Stat. § 8371, applies in this case. Mitchellville filed this action under the Pennsylvania statute, and maintains in its Opposition to Hanover's Motion that Pennsylvania law applies to the Policy.

Hanover disagrees and seeks dismissal of Mitchellville's bad faith claim because, it argues, Maryland law applies.

The Parties are in agreement regarding the relevant facts and law until the final step in the choice of law analysis. *See generally* MTD; Opp. The Parties agree that whichever state's law that governs the Policy dictates which state's bad faith statute should apply. *Id.* The Parties also agree that, as a federal court sitting in diversity in the District of Maryland, Maryland's choice of law rules govern the analysis. *Id.* Further, the Parties agree that Maryland courts generally follow the rule of *lex loci contractus* and apply the law of the jurisdiction where the contract was made, and that, in the insurance context, that is usually the state in which the policy was delivered and the premiums are paid. *Id.* Finally, the Parties agree that the Policy was delivered to Waynesboro GF LP in York, Pennsylvania. *Id.*

Hanover concedes based on those facts that "a Maryland court would ordinarily apply Pennsylvania law" to the Policy. It goes on to argue, however that Maryland law applies here under the doctrine of *renvoi*, an exception to Maryland's general choice of law rules. MTD at 4.

The Maryland Court of Appeals adopted a "limited application of *renvoi*" in *American Motorists Ins. Co. v. ARTRA Group, Inc.*, 659 A.2d 1295, 1301. *Renvoi* permits Maryland courts to apply Maryland law "where the application of *lex loci contractus* indicates that the foreign jurisdiction would apply Maryland law to the substantive issues of the controversy." *Id.* The Court explained:

> The doctrine of *renvoi* is basically that, when the forum court's choice-of-law rules would apply the substantive law of a foreign jurisdiction to the case before the forum court, the forum court may apply the whole body of the foreign jurisdiction's substantive law including the foreign jurisdiction's choice-of-law rules. If, in applying *renvoi* principles, the foreign jurisdiction's conflict of law rules would apply the forum's law, this reference back of the forum to its own laws is called a remission.

*\*\*\**

> Where the forum would apply the law of the foreign jurisdiction and the foreign jurisdiction would apply the law of the forum, it would seem that the balance should tip in favor of the jurisdiction with the most significant contacts or, if not to the jurisdiction with the most significant contacts, then for ease of application and to prevent forum shopping, the law of the forum should be applied.

*Am. Motorists Ins. Co.*, 659 A.2d at 1301–02.

Maryland courts apply the *renvoi* exception when (1) "Maryland has the most significant relationship, or, at least, a substantial relationship with respect to the contract issue presented; and (2) "The state where the contract was entered into would not apply its own substantive law, but instead would apply Maryland substantive law to the issue before the court." *Id.* at 1304. Hanover contends that both of the elements necessary to apply the *renvoi* exception are present in this case. MTD at 5–8. Mitchellville argues that neither of the elements are satisfied, and that Pennsylvania law therefore applies under Maryland's ordinary choice of law analysis. Opp. at 3–9.

With respect to the first element, I agree with Hanover that Maryland has, "at least, a substantial relationship with respect to the contract issue presented." *Am. Motorists Ins. Co.*, 659 A.2d at 1304. The parties, via a Maryland broker, negotiated the Policy to include coverage for property located in Maryland, which is where the subject loss occurred. And the issue before the Court is the scope of Hanover's obligations under the Policy with respect to that loss, as well as Hanover's purported bad faith in handling Mitchellville's claim. Although other factors certainly *also* indicate a relationship with Pennsylvania (more on that below), I need not assess for the purposes of the first *renvoi* element which state has the *greatest* interest, but only whether Maryland's interest is substantial. I find that it is.

The second *renvoi* element requires me to consider Pennsylvania's choice of law rules to determine whether a Pennsylvania court would apply its own substantive law or Maryland's to the Policy. *Am. Motorists Ins. Co.*, 659 A.2d at 1304. Pennsylvania's choice of law analysis begins

with comparing the laws of the two states to determine whether a "true conflict" exists between the two of them. "A true conflict exists 'when the governmental interests of [multiple] jurisdictions would be impaired if their law were not applied." *Budget Rent-A-Car Sys., Inc. v. Chappell*, 407 F.3d 166, 170 (3d Cir. 2005) (quoting *Lacey v. Cessna Aircraft Co*, 932 F.2d 179, 187 n. 15 (3d Cir. 1991)).

Here, the parties have both acknowledged in their respective filings that there is a "true conflict" between Pennsylvania's bad faith statute and Maryland's. MTD at 5 ("There is an obvious, real conflict between the potentially applicable laws."); Opp. at 5 ("Hanover argues that there is a true conflict between the Pennsylvania statute and the Maryland statute, and [Mitchellville] does not dispute this."). I agree. Under Pennsylvania law, a policyholder may recover from its insurer in a bad faith action "interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%," punitive damages, and court costs and attorneys' fees. 42 Pa. Stat. and Cons. Stat. § 8371. Maryland's bad faith statute, by comparison, does not authorize punitive damages, and caps attorneys' fees at "one-third of the actual damages recovered." Md. Code, Cts. & Jud. Proc. § 3-1701. Maryland and Pennsylvania seemingly enacted their respective statutes with different interests in mind, with Pennsylvania authorizing potentially greater recovery for the policyholder, and Maryland electing to limit such recovery. Thus, either state's interests would be impaired if the other's statute were applied.

Because this case presents a true conflict, "Pennsylvania choice-of-law rules 'call for the application of the law of the state having the most significant contacts or relationships with the particular issue.'" *Chappell*, 407 F.3d at 170 (quoting *In re Estate of Agostini,* 311 Pa.Super. 233, 457 A.2d 861, 871 (1983). Pennsylvania Courts undertake this assessment by applying a

"combination of the approaches of both the Restatement II (contacts establishing significant relationships) and 'interests analysis' (qualitative appraisal of the relevant States' policies with respect to the controversy.)" *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 231 (3d Cir. 2007) (quoting *Melville v. American Home Assurance Co.*, 584 F.2d 1306, 1311 (3d Cir.1978)).

The relevant Restatement factors are: "(1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties." *Hammersmith v. TIG Ins. Co.*, 480 F.3d 220, 233 (3d Cir. 2007) (citing Restatement (Second) of Conflict of Laws § 188(2)). "The weight of the relevant state's contacts must be measured on a qualitative rather quantitative scale." *Kilmer v. Connecticut Indem. Co.*, 189 F. Supp. 2d 237, 243 (M.D. Pa. 2002). Restatement (Second) § 193, which specifically addresses "contracts of fire, surety, or casualty insurance," provides that the rights created under such contracts "are determined by the local law of the state which the parties understood was to be the **principal location of the insured risk during the term of the policy**, unless with respect to the particular issue, some other state has a more significant relationship . . . to the transaction and the parties, in which event the local law of the other state will be applied." Restatement (Second) of Conflict of Laws § 193 (1971) (emphasis added). In light of Section 193, Pennsylvania Courts have noted that the location of the insured risk "is entitled to 'greater weight than any other single contact in determining the state of the applicable law.'" *Kilmer*, 189 F. Supp. 2d at 245 (quoting Restatement (Second Conflict of Laws § 193, comment b).

Here, the place of contracting was York PA, where the Policy was delivered. Compl. ¶ 23; MTD at 8; Opp. at 3. The contract was negotiated by a broker in Maryland. *See* Policy at 9. The

remaining factors are less clear from the record at the time Hanover's Motion to dismiss, and the parties did not provide any additional support in their Cross-Motions for Summary Judgment.[3]

With respect to the place of the parties' residence/domicile/incorporation, Hanover alleges, that Mitchellville's members reside in Pennsylvania, Florida, Maryland, North Carolina, and Virginia. MTD at 8. But the Complaint states that Mitchellville, a Limited Partnership, "is incorporated in Delaware and has its principal place of business in Pennsylvania." Compl. ¶ 3. Hanover is incorporated in New Hampshire. *Id.* ¶ 4; MTD at 8.

Regarding place of performance, Pennsylvania law provides that an insurance contract is generally considered to be performed where the premiums are received. *Hammersmith*, 480 F.3d at 234 n. 13; *Armotek Indus., Inc. v. Emps. Ins. of Wausau*, 952 F.2d 756, 761 (3d Cir. 1991). Mitchellville claims the relevant contact for this factor is Pennsylvania, but provides no support for that statement.

The subject matter of the contract "refers to the location of the insured risk." *Hammersmith*, 480 F.3d at 234 (citing *Manor Care, Inc. v. Cont'l Ins. Co.*, No. CIV.A. 01-CV-2524, 2003 WL 22436225, at *7 (E.D. Pa. Oct. 27, 2003)). Hanover highlights that the risk at issue in this case is located in Maryland and further emphasizes that the place of the injury and the conduct causing the injury occurred in Maryland. Reply at 2. But to determine the subject matter of an insurance policy, the focus is on the *contract*, not on the location of the specific underlying event that led to the subject litigation. *See Wilson v. Transp. Ins. Co.*, 889 A.2d 563, 571 (Pa. Super. 2005) ("When the issue in the case is coverage under an insurance policy, the case is a contract matter. . . . the court must apply the law of the state having the most significant contacts or relationships with the

---

[3]     The Court is not obligated to review the record to locate this information when the parties have neglected to direct its attention to the relevant materials.

contract and not the underlying tort."); *see also Pac. Emps. Ins. Co. v. Glob. Reinsurance Corp. of Am.*, 693 F.3d 417, 438 (3d Cir. 2012).

Here, there is no question that the principle location of the insured risk under the Policy is Pennsylvania. Only one of the ten properties covered under the Policy is located in Maryland. And when Hanover issued the Policy, it insured nine locations, all of which were located in Pennsylvania. As previously stated, the location of the insured risk "is entitled to 'greater weight than any other single contact in determining the state of the applicable law.'" *Kilmer*, 189 F. Supp. 2d at 245 (quoting Restatement (Second Conflict of Laws § 193, comment b). For that reason, and because the Policy was delivered in Pennsylvania, and because the only clearly established factor favoring the application of Maryland law is the place of negotiation, I conclude that the Restatement factors weigh toward a finding that a Pennsylvania court would apply its own bad faith statute.

The final step in Pennsylvania's choice of law assessment requires courts to consider "the interests and policies that may be validly asserted by each jurisdiction." *Melville*, 584 F.2d at 1311. Maryland certainly has an interest in the recovery available for property insured within its territory, and under a Policy brokered in the state. That said, I conclude that Pennsylvania's interest in regulating a Policy issued in Pennsylvania, to a Pennsylvania insured, and covering primarily property located in Pennsylvania is greater.

Because both the Restatement factors and the "interests and policies" factor both weigh in favor of applying Pennsylvania law, I conclude that a Pennsylvania court would not apply Maryland law in this case. Accordingly, the second *renvoi* factor is not met here, so the exception to the general choice of law rules does not apply. Hanover concedes in its Motion to Dismiss that under Maryland's choice of law rules, Pennsylvania law applies in this action. Accordingly,

Hanover's Motion to Dismiss is DENIED. And because Mitchellville has properly stated a claim under Pennsylvania's bad faith statute, I will proceed to reviewing the parties' Cross-Motions for Summary Judgment.

## II.    The Cross-Motions for Summary Judgment

The Parties' Cross-Motions for Summary Judgment focus on a single issue—whether the Policy's term that excludes coverage for "damage caused by or resulting from . . . [n]esting or infestation, or discharge or release of waste products or secretions, by insects, birds, rodents or other animals," ("Exclusion") bars Mitchellville from recovering under the Policy for the roof damage that the parties agree was caused by vultures. Policy at 34. In their Replies, the Parties agree that the dispositive issue is even narrower, and that this case turns on the definition of the word "infestation" as used in the Policy's exclusionary language. Mitchellville Reply at 1 ("Having now reviewed Hanover's opening brief, it is clear that this case turns on a single issue: whether Hanover has met its burden to establish that the "infestation" portion of the policy exclusion applies to bar coverage for Mitchellville's loss."); Hanover Reply ("The central issue presented in this case is whether Mitchellville's loss was caused by or resulted from an 'infestation' of turkey vultures within the meaning of the Hanover Policy, such that coverage is barred under Policy Exclusion B.2.d.(5).").

### A.    Factual Background

The facts underlying this interpretive disagreement are largely undisputed. The parties agree that the Property is covered under the Policy, and that Mitchellville timely reported the roof damage to Hanover in May of 2020. Mitchellville MSJ at 4; Hanover MSJ at 1. The parties also agree that the roof damage at issue in this case was caused by vultures pecking and/or tearing at

the roof. The parties disagreement relates solely to whether the vultures' presence or activity on the roof falls within the scope of the Exclusion.

Mitchellville and Hanover each retained independent entities to inspect, and in Mitchellville's case, repair, the roof damage. The inspectors agreed that the roof damage was caused by vultures, which they observed onsite during the course of their inspections and repairs.

Mitchellville hired Peach State Roofing, Inc. ("Peach State"), to inspect the roof, perform repairs, and eventually replace the section of the roof that was the most severely damaged by the vultures. Peach State submitted a Roof Condition Report ("Peach State Report"), which concluded that the damage to the roof and the resulting leaks were caused by vultures pecking, chewing, and tearing at the roof membrane. *See* ECF No. 31-6, Peach State Report. John Faircloth of Peach State stated in his deposition that during his first visit to the Property, which was conducted for the "investigative" purpose of determining the cause of the roof damage, "the first thing [he] noticed was a large amount of turkey vultures, anywhere from 50 to 75 turkey vultures perched on the front forward-facing wall." ECF No. 31-7, Fairchild Dep. at 25:14–26:7. Mr. Fairchild specifically recalled that the vultures were in numbers that "you don't see all the time, so it just kind of stuck with [him]." *Id.* Until the roof was replaced, Mr. Fairchild recalled seeing turkey vultures at the property on at least ten separate occasions, numbering "between 50 and 75" each time. *Id.* at 35:14–36:8. Mr. Fairchild further testified that the vultures were "[j]ust perched . . . on the storefront wall." *Id.* at 36:9–12. When asked if the vultures would fly away when he ascended to the roof, Mr. Fairchild stated: "Sometimes. In many cases, no. They were pretty bold. Honestly, they would just shuffle around. That's why it just resonates with me." *Id.* at 36:13–18. Once the severely damaged portion of the roof was replaced, Mr. Fairchild did not recall seeing vultures at the Property. *Id.* at 72:12–73:20. Before that section of the roof was replaced, Peach State visited

the Property "every time it rained," to perform patch repairs, which were apparently damaged by vultures each time they were replaced. *Id.* at 66:3–8; 38:8–46:17.

Hanover retained Bylt, LLC, to inspect the Property. Bylt's report includes "roof inspection notes" that state: "When arriving onsite we saw numerous large birds that were perched on the roof, accessories, and nearby light posts. Documentation of bird droppings were documented in areas of damage to accessories. It appeared the birds have perched on these items and caused them to loose [(sic.)] integrity of pipe jacks causing water intrusion in several areas." ECF No. 30-5, Bylt Report. Bylt's visit to the property was on May 29, 2020. *Id.*

Hanover also retained Peter Malmquist, a forensic engineer, to inspect the roof damage and determine the cause. Mr. Malmquist, too, concluded that the roof damage was the result of vulture activity on the roof. *See* ECF No. 31-14, Malmquist Report. Mr. Malmquist spoke with Helen Latchford, the property manager, in advance of his inspection. *Id.* at 1. Ms. Latchford told him "that since 2015,[4] the roof of the Popeyes Restaurant leaks when it rains. She added that they had patched the rood membrane, but the birds (buzzards) keep tearing off the patches." *Id.* Mr. Malmquist inspected the roof on July 13, 2020, and concluded that the "cause of the tears in the roof membrane is consistent with an animal chewing or bird pecking on the edges of the membrane." *Id.* at 2. Mr. Malmquist attached to his report several pictures of the Property including close-up images of the roof damage, the exterior of the property, and the interior of the Popeyes where there were moisture stains on the ceiling. Several of Mr. Malmquist's photos show vultures on the roof. *Id.* at 4–6.

---

[4]    Helen Latchford, the property manager for Mitchellville Plaza, testified that she would not have told Mr. Malmquist that there had been issues with the roof since 2015 because she had no involvement with the property until 2020. ECF No. 31-4, Latchford Dep. at 18:13–19:1.

Ms. Latchford, Mitchellville Plaza's property manager since 2020, testified that she was aware of leaks at the Property beginning sometime between February and April of that year. Latchford Dep. at 21:19–22:2. She understood that the roof leaks were caused by "the vultures." *Id.* at 22:14–17. Ms. Latchford testified that she saw 10–25 vultures on the roof at Mitchellville Plaza every time she was onsite, which was approximately once every two weeks. *Id.* at 23:2–24:6. Ms. Latchford also testified that she had at one point contacted District Wildlife Solutions to determine if anything could be done to get rid of the vultures. *Id.* at 25:12–27:22.

After reviewing Mitchellville's claim, Hanover concluded, citing the Exclusion, that the damages claimed were not covered under the terms of the Policy. ECF 30-10, July 30 Denial Letter. Mitchellville challenged that finding on the theory that the Exclusion was limited to damages caused by specific activities, namely, nesting and infesting, and that those activities were not present in this case. Mitchellville MSJ at 4–5. In response, Hanover submitted the following coverage question to the Property & Liability Resource Bureau ("PLRB") for guidance: "Is long-term buzzard problems that caused damage to roof excluded under nesting and infestation exclusions?". ECF 30-12, Claim Notes at 2. PLRB responded:

> A reasonable argument could be made that the term 'infestation' should be limited to loss caused by a group of turkey vultures, as opposed to damage caused by one turkey vulture. In general, courts have limited the infestation exclusion to losses involving hundreds if not thousands of one kind of animal, such as mites, termites, or bats. Since Photograph 5 within the [Malmquist] report shows what appears to be three turkey vultures perched on the northern parapet of the insured's building, there seem to be more than one turkey vulture present on the roof of the building. But how many turkey vultures constitute an infestation? This is unclear. Perhaps consultation with an expert might help clarify what constitutes an infestation of turkey vultures.

*Id.* at 4. Hanover sent Mitchellville another letter confirming the denial of coverage on October 29, 2020. ECF No. 30-11, Oct. 29 Denial Letter. Mitchellville filed this lawsuit on January 12, 2022.

Mitchellville retained Dr. Samantha Carouso-Peck, Ph.D., an ornithologist and animal behaviorist, as an expert in this case. Dr. Carouso-Peck reviewed two photographs and the denial letters from Hanover before preparing her expert report. ECF 30-13, "Carouso-Peck Report" at 1. Based on her review of those materials and drawing on her experience in the ornithological field, Dr. Carouso-Peck concluded, in relevant part:

> the damage to the roof was caused by pecking or shredding of the roof's protective membrane by the beaks of turkey vultures. However, by no definition of the term 'infestation' does the evidence suggest damage was due to an infestation of turkey vultures, given the behavioral ecology of turkey vultures as a species. None of the presented evidence suggests turkey vultures inhabited the roof in large numbers or long-term, or used the roof as a communal roost or nesting site. The evidence, and turkey vulture behavior, is far more consistent with the scenario of a small number of passing turkey vultures temporarily using the roof as a perching site.
>
> ***
>
> The membrane damage was most likely caused by one or a few vultures in a brief, acute incident or series of incidents. The activity of birds on the building did not constitute an "infestation."
>
> ***
>
> An acute visit of an animal or animals to a roof for a brief period of time, even if it results in damage to the roof, does not constitute an infestation.

*Id.* at 2.

Additional facts will be provided below as needed.

### B.      Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to

identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 251 (1986). Instead, the evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* In reviewing the evidence related to a motion for summary judgment, the Court considers the facts in the light most favorable to the non-moving party. *Ricci v. DeStefano*, 129 S. Ct. 2658, 2677 (U.S. 2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391– 92 (4th Cir. 2009); *Dean v. Martinez*, 336 F. Supp. 2d 477, 480 (D. Md. 2004).

### C.  Analysis

Under Pennsylvania law, an insurance policy is generally interpreted "by a court rather than by a jury." *401 Fourth St., Inc. v. Invs. Ins. Grp.*, 879 A.2d 166, 171 (Pa. 2005). "The purpose of that task is to ascertain the intent of the parties as manifested by the terms used in the written insurance policy." *Id.* The initial burden is on the insured to demonstrate that the claim falls within the scope of the applicable policy's coverage. *Butterfield v. Giuntoli*, 670 A.2d 646, 651–52. The burden then shifts to the insurer to demonstrate that the claim falls within a policy exclusion. *Id.* Here, there is no dispute that Mitchellville's claim falls within the scope of the Policy's coverage, so the burden is on Hanover to demonstrate that Mitchellville's claimed damages are barred by the Exclusion. As noted above, the parties' disagreement comes down to the meaning of the word "infestation" as it is used in the Exclusion.

When the policy's language is "clear and unambiguous" courts "must give effect to that language." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Com. Union Ins. Co*., 908 A.2d 888, 897 (Pa. 2006). If a policy term is ambiguous, "the policy is to be construed in favor of the insured

. . . and against the insurer, as the insurer drafts the policy, and controls coverage." *Id.* Policy language is ambiguous if "it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *401 Fourth St.*, 879 A.2d at 171 (quoting *Madison Const. Co. v. Harleysville Mut. Ins. Co*, 735 A.2d 100, 106 (Pa. 1999)). Consistent with those interpretive principles, "exclusions from coverage contained in an insurance policy will be effective against an insured if they are clearly worded and conspicuously displayed." *Frederick Mut. Ins. Co. v. Ahatov*, 274 F. Supp. 3d 273, 283 (E.D. Pa. 2017) (quoting *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 760 (3d Cir. 1985)). If the language of an exclusion is ambiguous, it "must be construed against the insurer, in favor of the insured." *Id.*

When reviewing an insurance policy to ascertain the parties' intent, "words of common usage" are to be "construed according to their natural, plain, and ordinary sense." *Madison Const. Co.*, 735 A.2d at 108. Pennsylvania courts will consult dictionary definitions of a word to determine what that "natural, plain, and ordinary usage" is. *Kvaerner Metals Div. of Kvaerner U.S. v. Com. Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006). The word "infestation" is not defined in the Policy, and there is no indication that the parties intended the term to have anything but its "natural, plain, and ordinary" meaning. *Whole Enchilada, Inc. v. Travelers Prop. Cas. Co. of Am.*, 581 F. Supp. 2d 677, 697 (W.D. Pa. 2008). Accordingly, I begin by looking to dictionary definitions of the words "infest" and "infestation" to determine what kinds of damages are barred by the Exclusion.

Hanover, correctly anticipating this analysis, provides the following dictionary definitions for "infestation" in its Cross-Motion for Summary Judgment:

- Infest: "1. to spread or swarm in or over in a troublesome manner…; 2. to live in or on as a parasite." https://www.merriam-webster.com/dictionary/infest.

- Infestation: "a large number of insects, rats, etc. living in a place where they are not wanted, often causing damage or disease." https://www.oxfordlearnersdictionaries.com/us/definition/english/infestation.
- Infestation: "1. the act of infesting; state of being infested. 2. a harassing or troublesome invasion." https://www.dictionary.com/browse /infestation.
- Infest: "1. To inhabit or overrun in numbers or quantities large enough to be harmful, threatening, or obnoxious. 2. To live as a parasite in or on." https://www.thefreedictionary .com/infestation.

Some additional dictionary definitions include:

- Infest: "To attack, assail, annoy, or trouble (a person or thing) in a persistent manner; to molest by repeated attacks; to harass." Oxford English Dictionary (2022).
- Infestation: "The act of infesting, assailing, harassing, or persistently molesting." Oxford English Dictionary (2022).
- Infest: "(of insects or animals) be present (in a place or site) in large numbers, typically so as to cause damage or disease." Oxford Languages (2022).
- Infestation: "the presence of an unusually large number of insects or animals in a place, typically so as to cause damage or disease." Oxford Languages (2022).
- Infest: "(of animals and insects that carry disease) to cause a problem by being present in large numbers." Cambridge Dictionary, available at https://dictionary.cambridge.org/us/dictionary/english/infest.

Mitchellville, on the other hand, relies exclusively on Dr. Carouso-Peck's report to establish what it contends is the definition of "infestation" as used in the Exclusion. Mitchellville argues that "[t]hough it is undisputed that bird were present on the roof and were pecking at the roof membrane, the only ornithological expert who will testify, Dr. Samantha Carouso-Peck, is abundantly clear that this damage was **not** caused by [] infestation[.]" Mitchellville MSJ at 11–12.[5]

Dr. Carouso-Peck takes the position that "[f]rom a biological standpoint, the key components that define infestation, as with an infestation of cockroaches or rats, are a) that they

---

[5]     Hanover contends that Dr. Carouso-Peck's report is inadmissible because she offers her opinion on the ultimate issue of the correct interpretation of "infestation." Hanover MSJ at 16. But Dr. Carouso-Peck's does not purport to interpret the Policy. Rather, it purports to offer a "biological" definition of the term in the specific context of the typical behavior of turkey vultures.

be present in large numbers, b) that they be persistently present in the same area for a length of time ('resident'), and c) that they cause damage or disease, as in 'infested with parasites.'" Carouso-Peck Report at 4–5. Based on that definition, Dr. Carouso-Peck applied her knowledge of turkey vultures' unique behavioral ecology to determine that the damage caused was not caused by an "infestation" of turkey vultures.

Dr. Carouso-Peck's approach would require an expert witness informed, species-specific analysis to determine whether there is a large enough number of animals present to constitute an "infestation" in each instance based on the behavioral ecology of the offending species. She acknowledged this in her deposition, explaining that the number of animals required to constitute an infestation, "of course, [] can vary from species to species" and that while that number is "typically on the order of hundreds or thousands . . . an infestation of turkey vultures could be a number greater than 50, perhaps." Carouso-Peck Dep. at 67:18–68:10. Furthermore, when Dr. Carouso-Peck was asked for the source of her biological definition, she explained that she had, for the purposes of her report, relied on some of the same dictionary definitions proposed by Hanover:

> Q:   Can you give me a source for this biological definition of infestation?
> A:   If you would scroll further down, I believe I provide a few, though I don't remember where. Keep going, please?
> …
> A:   **So, as you can see, these are obviously not strictly biological sources but common definitions from the Oxford Dictionary, which defines infest as to be present in a place or site in large numbers. And Dictionary.com says to live in or overrun to an unwanted degree.**
> Q:   **Okay. So, it's not a biological term; you're just using the common definition of infestation?**
> A:   **For the purposes of this report, yes.** …

*Id.* at 68:16 – 69:18 (emphasis added).

There is no indication that the parties intended to incorporate into the Policy a species-specific "biological definition" when they agreed to exclude coverage for damages arising out of

animal infestation. And it is clear from the dictionary definitions offered by both parties that the word "infestation" is not defined by a specific number of any particular animal. Instead, the plain and ordinary definition of the word "infestation" is the unwanted and persistent presence of a number of animals large enough to cause harm or damage.

The undisputed eyewitness testimony presented in this case demonstrate that the vulture activity on the Property constituted "infestation" within the term's plain and ordinary meaning. Mitchellville's own roofer, who was on the property more than ten times over a period of months testified that there were vultures on the roof every time he visited, and he estimated that they numbered between 50 and 75 each time he was there. Mitchellville's property manager also testified that over the course of months, during which she visited the property every two weeks, she saw between 10 and 25 vultures on the roof each and every time. Hanover's adjuster and the forensic engineer it retained to determine the cause of the damages visited the Property on different dates and both observed vultures on roof. Furthermore, Mitchellville does not dispute that the vultures caused the roof damage, and that attempts to repair that damage by patching the damaged areas were futile because the vultures would simply pull them up again. In short, there is no dispute that vultures were persistently present on the roof of the Property over a period of months, and that they repeatedly damaged the roof by pecking and tearing at its membrane and at the site of the attempted patch repairs.

Despite its acknowledgment that repeated vulture activity caused the recurring roof damage on the Property, Mitchellville insists based exclusively on Dr. Carouso-Peck's Report that there was no "infestation." Dr. Carouso-Peck concluded in her report that the activity on the Property's roof was not consistent with "infestation," but was more consistent with "the scenario of a small number of passing turkey vultures temporarily using the roof as a perching site." Carouso-Peck

Report at 2. Dr. Carouso-Peck went on to opine that "the membrane damage was most likely caused by one or a few vultures in a brief, acute incident or sequence of incidents. . . . [N]o evidence exists that the vultures were resident, present for long periods of time, nesting, roosting, or present in large numbers. Rather, the lack of evidence of long-term turkey vulture presence on the roof suggests that the damage to the membrane was caused by a single or a small number of vultures, potentially attracted to the membrane by the sound of it expanding in the sun. These vultures appear to have then investigated the membrane and chewed or pecked it in search of insects beneath it, as turkey vultures are known to regularly do, but then departed upon discovering nothing edible." *Id.* at 4–5.

Dr. Carouso-Peck looked at two photographs of the Property roof, and consulted Google Maps and Google Images before writing her expert report—she did not visit the Property. Carouso-Peck Dep. at 53:9–12; 54:3–10; Carouso-Peck Report. Based on those two photographs and the images she found with Google Maps and Google Images, Dr. Carouso-Peck concluded that there was no vulture "infestation" based on the absence of "feces, regurgitate, feathers, et cetera, that one would expect of a vulture roost or a vulture infestation." *Id.* at 108:3–11.

The conclusions in Dr. Carouso-Peck's report conflict directly with the testimony of multiple eyewitnesses, including two who saw a minimum of 10 vultures, and as many as 75, each time they visited the property over the course of months. What's more, Dr. Carouso-Peck "concede[d]" during her deposition "that a number of vultures, 15 to 25, perched on that roof, perhaps with some regularity," which directly conflicts with the conclusion in her report that the roof damage was caused by "one or a few" vultures in an isolated incident, or a series of isolated incidents. The conflicting conclusions of Mitchellville's expert, who never set foot on the Property, does not establish a genuine dispute of material fact that defeats summary judgment.

The undisputed facts of this case show that anywhere between 10 and 75 vultures were persistently present on the roof of the Property for a period of months, and that they repeatedly damaged the roof of the Property by pecking and tearing at its membrane, and by ripping up the patches that were intended to repair that damage. Those undisputed facts establish that the subject damages were caused by an "infestation" of vultures given the plain and ordinary meaning of the word. Accordingly, the damage to Mitchellville's roof fall cleanly within the scope of the Exclusion and are not covered under the unambiguous terms of the Policy.

Because Hanover appropriately denied coverage under the terms of the Exclusion, Mitchellville's claim for bad faith must also fail. In order to recover for an insurer's bad faith under Pennsylvania law, an insured must demonstrate "(1) that the insurer lacked a reasonable basis for denying benefits; and (2) that the insurer knew or recklessly disregarded its lack of a reasonable basis." *Williams v. Hartford Cas. Ins. Co.*, 83 F.Supp. 2d 567, 571 (E.D. Pa. 2000) (citing *Terletsky v. Prudential Prop. & Cas. Ins. Co*., 649 A.2d 680, 688 (Pa. Super. 1994)). Obviously, an insurer who properly denies coverage under the terms of an exclusion has a reasonable basis for doing so and has not acted in bad faith.

## CONCLUSION

For the reasons identified in this Memorandum Opinion, Hanover's Motion to Dismiss, ECF No. 14, is DENIED, Mitchellville's Motion for Summary Judgment, ECF No. 30, is DENIED, and Hanover's Cross-Motion for Summary Judgment, ECF No. 31, is GRANTED. A separate Order will be issued contemporaneously with this Opinion.

Date:   September 26, 2022

                                                                    _____/S/_____
                                                                    Paul W. Grimm
                                                                    United States District Judge